LittletoN, Judge,
delivered the opinion of the court:
The patents in suit all relate to steam turbines, in which the steam, admitted at relatively high pressure into one end of the turbine casing and exhausting at lower pressure at the other end of the turbine, yields energy due to its expansion which directly rotates the shaft of the turbine through the instrumentality of turbine blades or “ buckets ” fixedly attached to the turbine shaft.
Steam turbines are of two principal classes; namely, reaction and impulse turbines. These two classes operate upon different principles. In the former the rotation of the shaft is primarily caused by the reaction or “ kick-back ” of the steam against the moving blades carried by the shaft due to a drop in pressure and consequent expansion as it issues from the channels between these blades.
Parsons was the leading exponent and developer of reaction turbines. All the patents in suit show reaction turbines.
The principle of operation of an impulse turbine is that the steam expands in its passage through stationary nozzles, thus acquiring high velocity, and the momentum of the jets of steam issuing from these nozzles at high velocity and impinging against blades attached to the shaft causes the shaft, to which they are attached, to rotate. All of the Government turbines involved in this case, with the exception of certain turbines made by the Westinghouse Electric & Manufacturing Company, are impulse turbines.
*790 Turbines may be simple or compound. In a simple turbine there is only one series of rotating blades if the turbine be of the reaction type, and only one series of nozzles and one series of rotating blades if it be of the impulse type. In a simple turbine all the energy of the steam is extracted in one stage, by one drop in steam pressure. The energy of the steam can not be economically extracted in a single stage and, therefore, in modern practice, turbines are usually pressure-compounded, being constructed with a series of pressure stages, each stage involving, in the case of a reaction turbine, a ring of moving blades attached to the shaft and a ring of fixed blades carried by the casing, the function of which fixed blades is to redirect the steam issuing from the ring of moving blades so that it will enter the next ring of moving blades at the proper angle; and, in the case of an impulse turbine each stage involving a series of fixed nozzles and a ring of rotating blades. At each stage there is a drop in steam pressure amounting only to a portion of the total pressure drop from inlet to outlet of the turbine, and the energy of the steam is thus extracted in a series of successive stages instead of in one as in the simple turbine. An impulse turbine may be velocity-compounded as well as pressure-compounded. There may be in a single pressure stage of an impulse turbine a plurality of rings of moving blades, instead of a single ring of moving blades, each ring extracting a portion only of the velocity of the steam passing through the stage.
Turbines may also differ in detail as to the direction in which the steam passes through the blades. In some cases the steam passes through the blades to which it gives up its energy in a direction generally parallel to the shaft of the turbines, the blades being appropriately mounted. Such turbines are called parallel or axial flow turbines. In other cases the general direction of the steam as it passes through the moving blades is radial to the turbine shaft, the blades here being differently mounted. Such turbines are described as radial-flow turbines. Parallel-flow turbines are more commonly used than radial-flow turbines, but both are practical forms.
*791 The first patent in suit, No. 708780, was issued September 9,1902, on an application filed February 13, 1900. Claims 1 and 2 are charged to be infringed.
This patent shows combined ahead and reversing turbines, both of the reaction type, mounted on the same shaft and in a common casing and having a common exhaust passage to the condenser. Both turbines are shown as compound turbines, having a large number of rings of fixed blades mounted on the casing and a large number of rings of moving blades interspaced between the rings of fixed blades and mounted on the ahead drum and the reversing drum, respectively.
The patent shows Figs. 1, 5, and 6, respectively, three different combinations of ahead and astern turbines, as follows:

*792

Plaintiffs direct attention only to the first of these forms, that of Fig. 1. This is the only arrangement alleged to have been used by the Government. It is insisted that the telescoping of the reversing turbine within the main turbine, which is a feature of claim 2, in suit, is found in Fig. 1 construction. The defendant contends that Fig. 5 is the only •form showing, or described in the patent as showing, such telescoping.
The claims in suit are as follows:
“1. In parallel-flow turbines, in combination, a complete main turbine having its own casing and its own drum and having a plurality of rings of blades supported from said casing and a plurality of interspaced rings of blades supported from said drum, an exhaust-passage leading from said main turbine, a complete reversing-turbine having its own casing and drum and having a plurality of rings of blades carried by the casing and plurality of interspaced rings of blades supported from the drum, said turbines being mounted on the same shaft, and the exhaust end of the reversing-turbine being connected with the said exhaust-passage from the main turbine inside the main turbine-casing substantially as described.
“2. In combination, a complete main turbine having a plurality of rings of blades supported from an outside casing interspaced between a plurality of rings of blades supported from an inside drum and a complete reversing-turbine having a plurality of rings of blades supported from an outside casing interspaced between a plurality of rings of blades supported from an inside drum, the said reversing-turbine being telescoped within the said main tur *793 bine to reduce longitudinal space occupied, substantially as-described.”
A combined ahead and reversing turbine has the advantage of saving parts and space; both turbines being included in a common casing, only one pair of bearings is required instead of two pairs which would be necessary if the turbines were placed in separate casings, and likewise one pair of packing glands is saved. There is also a saving’ in space and weight.
The Government uses combined ahead and astern turbines mounted in a common casing and with a common exhaust passage to the condenser, but its astern turbines differ from those of the patent in that they are in all cases impulse and not reaction turbines.
We are of opinion that this patent is invalid for want of patentable novelty over the prior art. The Rateau or Pitt patents, British patent No. 24204 of 1898 taken out in the name of Pitt, defendant’s Exhibit D-21, and corresponding French patent No. 278293 of 1898, defendant’s Exhibit D-22, being substantially identical, show a combined ahead and astern marine turbine in which both turbines are mounted on a common shaft in a common casing and have a common exhaust to the condenser. The subject matter, which plaintiffs contend make a case of infringement, is the combination of an ahead and an astern turbine mounted on a common shaft in a common casing, having a common exhaust to the condenser, both of the turbines being of the parallel flow type and both of them being compounded.
Rateau showed this with the exception that the astern turbine he shows was a simple turbine instead of a compound turbine.
Fig. 1 of the Rateau British patent No. 24204 of 1898 is shown below:

*794

*795 This patent shows a marine tnrbine having the shaft H connected to the propeller shaft. This shaft is rotated in one direction for ahead motion by means of the ahead turbine which occupies the bulk of the figure toward the left, and is rotated in the opposite direction for astern motion by the reversing turbine shown at the right of the figure. For ahead motion steam is admitted through the pipe A at the left and flows through successive rings of nozzles and rotating blades, indicated, respectively, by the characters Bl, Cl, B2, C2, etc., from left to right and exhausts to the condenser through the exhaust passage K at the right.
Steam for astern motion is admitted to the reversing turbine through the pipe L at the right to a ring of nozzles, one of which is shown in section just below the letter N, and impinges on a ring of rotating blades, two of which are shown in section, unlettered, to turn the propeller shaft in the reversing direction. Emerging from these blades, the steam is deflected through an angle of 180° by the passage marked “n ” whence it discharges into the same exhaust passage K which is used for the ahead turbine.
It is apparent that Bateau disclosed the idea of combining an ahead and an astern turbine mounted on a common shaft and within a common casing and discharging throiigh a common exhaust passage to the condenser. His ahead turbine is compounded; i. e., it has a number of pressure stages subdividing the pressure drop from inlet to outlet end of the turbine, while his astern turbine is a simple one-stage turbine, having only one ring of nozzles and one ring of moving blades.
Plaintiffs point to the fact that Bateau’s astern turbine is not compounded, as distinguished from the .patent in suit in which both ahead and astern turbines are compounded.
The principles of compounding as applied to both impulse and reaction turbines were perfectly familiar in the art at and before Bateau’s time, and we think nothing more than ordinary skill of turbine engineers would be involved in substituting for Bateau’s single-stage turbine a compound astern turbine of greater power and greater efficiency for the astern turbine than the single-stage turbine if it was desired.
*796 Since Rateau showed his ahead turbine compounded it seems evident that he would have compounded his astern turbine also if he had been willing to incur additional cost and to tolerate increased size which additional rings of nozzles and blades would have required. The evidence shows that Kateau’s turbine was entirely workable and practical for marine propulsion and that modification of his reversing turbine to make it a pressure-compounded turbine instead of a single-stage turbine would have necessitated a design similar to that shown in Parsons’ patent No. 708780, and that such a design would have been within the ordinary skill of any turbine designer.
The Schulz patents, British No. 10503 of 1898, and French No. 277365 of 1898, show the substance of the Parsons’ patent in suit. As hereinbefore stated the common subject matter between the Government turbines and those disclosed in the patent in suit pointed out by plaintiffs, and upon ■which they base the charge of infringement, is the combination of an ahead and astern turbine mounted on a common shaft in a common casing and with a common exhaust to the condenser, both turbines being of the parallel-flow type and both being compounded. Schulz showed this combination, including the compounding of the astern turbine, with the exception that for an astern element he used a radial flow instead of the parallel-flow type. The British and French Schulz patents are substantially similar, and Fig. 6 of the British patent is shown below:
In this patent Schulz here shows a combined ahead and astern reaction turbine for marine use, both the ahead and the reversing turbines being compounded; that is, each having a plurality of rings of fixed blades and a plurality of rings of moving blades. The ahead turbine comprising the bulk of the figure is composed of a large number of rings of fixed blades carried on the conical casing G, and, inter-spaced therewith, moving blades b carried on a conical drum. This conical shape is provided in order to take care of the increasing volume of steam as it passes through the turbine from the high-pressure end to the low-pressure end, and is equivalent to the usual practice of the patentee, Parsons, of starting with a small diameter drum and stepping up *797 in definite steps to larger diameters toward the low-pressure end of the drum.
Schulz’s astern turbine is compounded and consists of two rings of moving blades T1 mounted on the end of the drum and alternating with rings of fixed blades carried by the casing. Schulz made his astern turbine smaller than his

ahead turbine, obviously for economy of space and cost, inasmuch as efficiency in an astern turbine is not essential.
Both of Schulz’s turbines are mounted on a common shaft in a common casing and discharge to the condenser through a common exhaust passage. Steam may be admitted either to the ahead turbine through the inlet a, or to the reversing turbine through the inlet e by manipulating the valve x.
The plaintiffs contend for a distinction between the Schulz and the Parsons’ patents in suit in that the former used a radial-flow turbine instead of a parallel flow for *798 the astern turbine. In our opinion the Schulz patent discloses the idea of combining two compound turbines, one for ahead and one for astern running in one casing with a common exhaust to the condenser, and that any turbine engineer with ordinary skill of the calling would substitute a parallel-flow turbine for the reversing element if for any reason he preferred the parallel-flow type and was willing to use the extra space which that type requires.
The advantages inherent in a combined ahead and reversing turbine are equally obtained if a radial-flow reversing turbine is used instead of a parallel-flow reversing turbine, and it was within the ordinary skill of turbine engineers in 1898 and thereafter to substitute for the radial-flow reversing turbine shown in the Schulz patent a parallel-flow reversing turbine, as shown in the patent in suit.
The evidence further establishes that the Schulz patent was a practical working turbine for marine installations and that the difference between radial-flow and parallel-flow turbines is immaterial as far as obtaining advantages of Fig. 1 of the patent in suit are concerned.
Little need be said with reference to the claim of infringement based upon the statement in claim 2 of the patent in suit with reference to the telescoping of the reversing turbine within the main turbine to reduce longitudinal space occupied. Fig. 5 of the patent in suit shows the telescoping of the astern turbine within the ahead turbine, but this feature is not found in Fig. 1 of the patent in suit. There is no telescoping of the astern turbine within the ahead turbine in the sense of the patent in any Government turbine charged to infringe. The word “ telescoped,” which specifically defines a certain relationship of parts, can not, in our opinion, be applied to the mere inclusion of two turbines in a common casing.
The second patent in suit, No. 769272, was issued September 6, 1904, on an application filed June 27, 1902. This patent expired September 6, 1921. Claim 1 is charged to be infringed.
This patent relates to combinations of main turbines for driving vessels at high speeds and cruising turbines used in conjunction with main turbines for drivng at lower or *799 erasing speeds. The term “ cruising speed ” does not imply any fixed or definite rate, but only the lower rate of speed at which the vessel runs when no emergency demands high speed. A cruising turbine is merely a. smaller turbine than, the main turbines of the ship intended to be used at cruising speeds, when less steam is required, and better economy of steam is obtained at low speed by admitting the steam into smaller turbines, called cruising turbines, and passing it thence in series through the main turbines, than would be' obtained by throttling down the steam and admitting it direct to the large capacity main turbines.
It is a well-known principle that, within reasonable limits, more economical and efficient use of steam is obtained by passing it through a larger rather than a smaller number of stages, and since there is a limit to the number of stages that can be included in one turbine, for mechanical reasons, the large number of stages required for maximum economy means the use of a plurality of separate turbines in series relation; i. e., a high-pressure turbine followed by a low-pressure turbine, which latter is driven by the steam exhausting from the high-presure turbine.
The system of turbines shown in this patent, No. 769272, in suit, is shown in Fig. 1 below:

*800 The above Fig. 1 is illustrated in a simplified sketch, defendant’s Exhibit D-37, as follows:

This patent shows a ship installation having three propeller shafts, with a main turbine set of three turbines, one mounted on each of the three shafts, the high-pressure main .turbine a on the central shaft and the two low-pressure turbines, b and o, into which it exhausts, on the side or “ wing ” shafts, and an additional or cruising turbine set consisting of two cruising turbines, d and e, connected in series with each other and with the main turbine set, which cruising turbines are mounted on the “wing” shafts, respectively.
At high speeds the steam is admitted direct into the main high-pressure turbine and exhausts therefrom into the two main low-pressure turbines, whereby economy of steam is obtained at high speeds by passing it through a plurality of turbines in series, and this one set of turbines, with live or boiler .steam admitted to only one of them, produces a *801 balanced distribution of power over all three of the propeller shafts. At high speeds the cruising turbines are not -used.
At low speeds steam is admitted into the cruising turbine d and after exhausting therefrom passes successively to the. second cruising turbine e, the main high-pressure turbine a and the two main low-pressure turbines i and c. In this uase there is an economical use of the steam at cruising :speeds inasmuch as the steam passes in series through both turbines of the cruising turbine set and also through the main turbine set. Steam is admitted from the boiler to only .one turbine of the whole installation, but the succeeding turbines are arranged so as to produce a balanced distribution of power for operating all the propeller shafts on the ¡ship.
This patent also shows a non-return valve, marked “11” ’in Fig. 1 of the patent, interposed in the steam connection between the cruising turbine set, and the main turbine set, which valve allows steam to pass freely from the cruising turbine set to the main turbine set, but automatically closes .to prevent passage of steam in the reverse direction. This is the element referred to in claim 1 in suit as “automatic means for preventing a back flow of steam from the main turbine set to the additional turbine set.”
The claim- of the patent charged to be infringed is as follows:
“ 1. A system of turbines for propelling vessels consisting ■of a main turbine set for propelling the vessel with high economy at fast speeds, and an additional turbine set adapted to be put in series with the main turbine set when the vessel is to be propelled with high economy at cruising •and low speeds, and automatic means for preventing a back flow of steam from the main turbine set to the additional turbine set when the former set is propelling the vessel at fast speed, substantially as described.”
We think it is clear that the terminology of claim 1 is not applicable to the Government construction and that there has been no infringement. In order to hold otherwise it would be necessary to disregard the plain language of *802 the claim in suit and to hold that a single turbine is a. “turbine set.” The ordinary dictionary meaning of the. term “turbine set,” as well as the evidence in this case,, establishes that the term implies a plurality of separate-turbines operating in series relationship, that is, with the steam which exhausts from one passing through the other turbine or other turbines in the set. In the Government installation there is in no case more than one cruising turbine in series with any main turbine. The two cruising turbines,, located on the two sides of the ship, respectively, have-, nothing to do with each' other. They do not operate in series and they do not constitute a “turbine set.” In no Government vessel, therefore, is there the “additional turbine set adapted to be put in series with the main turbine set,” which the claim requires. We are further of the opinion, from a consideration of the evidence, that every feature of this patent which the Government’s installations, or any of them, have in common with it was old in the art prior, to the date of the patent in suit.
Little need be said with reference to the automatic non-return valve referred to in the claim in suit as the “ automatic means for preventing a back flow of steam from the main turbine set to the additional turbine set when the former is propelling, the vessel at fast speed.” The fact is. established that non-return valves similar to that shown in the patent in suit have been in common use in-steam lines for many years and had been so used many years prior to the date of filing of the application for the patent involved. In the situation in which it used in the system shown in the patent, this valve performs no different function from that of a non-return valve in any steamline. The non-return valves used in the Government installations charged to infringe this valve-have been employed for various purposes in marine installations as early as 1897. The installation of a non-return valve in a situation such as is involved in this case, where it is desired to allow steam to flow in one direction while-preventing it from flowing in the opposite direction, is a common expedient familiar to every engineer and involves- *803 nothing more than the exercise of ordinary skill. The use of a device, which is old and well known, which does automatically that which formerly had been done manually is not invention. Jones et al. v. General Fireproofing Co., 254 Fed. 97; French et al. v. Buckeye Iron & Brass Works, 10 Fed. (2d) 257; General Electric Co. v. Eisler et al., 20 Fed. (2d) 33; In Re Rundell, 48 Fed. (2d) 958.
The first prior art patents to which we shall refer in connection with the patent in suit are the British Schulz patent No. 8378 of 1901, defendant’s Exhibit D-42, and the corresponding United States Schulz patent No. 725880, defendant’s Exhibit D-45. We insert here Fig. 1 of the aforementioned patents.

*804 The system of turbines shown in these patents is illustrated in a simplified sketch, defendant’s Exhibit D-41, being a two-shaft arrangement as follows:

Schulz shows four turbines mounted on a single propeller shaft, these being numbered, respectively, 1, 2, 3, and 4, which increase in size jorogressively from 1 to 4. His purpose like that of the Parsons’ patent in suit, was to obtain maximum economy of steam when working at both low and high speeds. Pie describes several methods of operation, among others a mode of operation for low speeds in which steam is admitted to turbine 1 and passes thence in successive series through turbines 2, 3, and 4 to the condenser, this being the mode of o£>eration for maximum economy at low speeds. Another mode of operation described as for higher speeds is to leave the smaller turbines 1 and 2 idle and admit steam direct to turbine 3, the steam which exhausts therefrom passing through turbine 4 to the condenser. A valve is *805 shown in the pipe line between turbines 2 and 3 to prevent back flow of steam from turbine 3 into turbines 2 and 1 in this high-speed operation.
In this system turbines 1 and 2 are a cruising turbine set functioning in the same way as the cruising turbine set of the Parsons’ patent in suit, and turbines 3 and 4 are a main turbine set functioning in the same way as the main turbine set of the patent in suit. Schulz’s turbines cooperate to produce economy, both at high and at cruising speeds, as do the cruising set and the main set of the patent in suit.
The fact that Schulz provides for additional modes of operation whereby for extreme high speeds steam may be admitted in parallel into turbines 1, 2, and 3 and exhausted from all of them into turbine 4 is immaterial to the question of anticipation of the system shown in the patent in suit.
The duplication of the Schulz system shown as applied to one propeller shaft on a second propeller shaft in a two-propeller ship, which the evidence establishes would involve nothing more than ordinary engineering skill, would produce all that any of the Government installations would have in common with the patent in suit. In such a case there would be not only a main turbine set for operation with high economy at high speeds, but an additional cruising turbine set of two cruising turbines, operating in series with each other and with the main turbine set to produce high economy at low speeds, which the Government installations do not have. The claim in suit is not limited to any special arrangement of turbine uriits with reference to number of propeller shafts.
Aside from the nonreturn valves, the Schulz patents show all that any of the Government installations have in common with the patent in suit.
The next patent in the prior art is one to Parsons, being United States Patent 608969 granted August 9, 1898, on an application filed March 4, 1898, which we think shows the sustance of all features which are common to the Parsons’ patent in suit and to any of the Government turbine systems. Fig. 3 of this patent is shown below:

*806

This prior Parsons’ patent No. 608969 sIioavs a three-propeller shaft installation. The evidence shows that only ordinary engineering skill would be required to substitute a two-propeller shaft installation in the manner shown in a simplified sketch in evidence as defendant’s-Exhibit 40, as follows:

*807 Comparison of the above shown simplified sketch with the ■Government installations on the Gushing and other vessels, defendant’s Exhibit D-37-A, shows no difference between -them except that in the Government installations the cruising turbines are geared to the pi*opeller shaft instead of •being directly connected thereto, which is immaterial so far as the patent in suit is concerned, and that there is no automatic nonreturn valve in the pipe line between the cruising •turbines and the main turbines in the structure of the prior Parsons’ patent. This prior patent to Parsons describes, among other methods of operation for the turbines which it shows, those which are indicated on the simplified diagram, i. e., for relatively low speeds admitting the steam to the ■smaller turbines A and B, which are properly called “ cruising turbines,” and exhausting it thence from A and B, respectively, to the main turbines A1 and B1, respectively; and for high speeds admitting the steam directly to the main turbines A1 and B,:L, respectively, as is done in the •Government systems.
Although the methods of operation stated above may not •be the only methods of operation set forth in the prior Parsons’ jpatent No. 608969, it being also suggested in the patent that for extreme high speeds steam may be admitted separately and independently to all of the turbines in the installation exhausting from each turbine to the condenser; -and that for extremely low speeds steam may be admitted to only one turbine of the whole series and may exhaust from that turbine successively to all of the turbines in the •series, the prior patents showed not only the subject matter present in the Government turbines, but also other possible .modes of operation. Additional methods of operation are of no consequence on the question under consideration. This prior patent to Parsons was not cited by the Patent Office .against the application for the patent in suit.
We are of opinion that all features which any of the Government turbine installations have in common with the pat■ent in suit were obvious to engineers skilled in the turbine :art, in view of the disclosures of the prior patents to Schulz .and to Parsons.
*808 The third patent in suit, No. 790744, was issued May 23, 1905, on an application filed September 19,1904. This patent relates to packings or “ glands ” for shafts, such as turbine shafts, and its purpose is to produce a “nearly constant gradation ” of steam pressure through the packing by providing therein a plurality of “ lantern spaces ” or pockets, maintained at different pressures, so as to prevent undue wear on the packings with constant leakage of steam.
Claims 2 and 3 which are charged to be infringed, are as follows:
“ 2. A ring packing gland for rotating shafts comprising; a number of rings on the shaft and a plurality of lantern spaces disposed around the shaft, said lantern spaces communicating with noncontinuous parts in the ring packing- and with suitable steam spaces, substantially as described.
“ 3. A ring packing gland for the rotating shafts of turbines, comprising a number of rings on the shaft and a. plurality of lantern spaces communicating with noncontinuous parts in the ring packing, one of said lantern spaces-being supplied with steam, while the others are exhausted to suitable points in the expansions of the engine, substantially as described.”
If the steam pressure inside a turbine at the point where the shaft passes through the casing is super atmospheric,, there is a tendency for steam to leak out along the shaft into the engine room, thereby causing damage to equipment in the engine room. If the pressure inside a turbine at a point where the shaft passes through the case is subatmospheric there is a tendency for air to leak into the turbine along-the shaft and thence pass to the condenser, thereby destroying or impairing the vacuum in the condenser necessary for-efficient operation. Packings are, 'therefore, provided on such shafts to prevent escape of steam into the engine room, and ingress of air into the turbine. Packings about a shaft-passing from a point in the turbine where the pressure is-superatmospheric, to the atmosphere, are designated in the record as high-pressure packings. Those packings about a. shaft passing from a point in the turbine where the pressure *809 is subatmospheric, to the atmosphere, are designated in the record as low-pressure packings.
Where the pressure inside the turbine is superatmospheric, steam can be prevented from leaking to the engine room to a detrimental extent by providing a “ lantern space ” or pocket in the packing and connecting it by piping to some point in the turbine system into which the steam leaking through the packing can be conducted, the steam pressure in the pocket being maintained at substantially atmospheric pressure. Likewise, when the pressure inside the turbine is. subatmospheric, leakage of air into the turbine can be prevented by providing such a lantern space or pocket and conducting to it steam from an outside source at substantially atmospheric pressure. That which has been stated above was admittedly old prior to the patent in suit, which states, on page 1, lines 12-21, that it was old to provide such a packing with one lantern space for these purposes. The patent involved relates specifically to packings in which a plurality of lantern spaces are provided. It is stated on page 1, line .21, as follows:
“I have found that with high-speed shafts when the glands are packed with Namsbottom rings or other contract or rubbing packing, which is pressed into close contact by the fluid pressure upon the gland, the packing is liable to undue wear when the fluid pressures are high, and, further, where the packing devices are of the ring-and-groove type, .such as is used in my turbine dummy pistons, where heavy pressures have to be dealt with, the packings have to be made to allow of considerable leakage or they have a tendency to cut or become rapidly destroyed; and the objects of the present invention are to prevent undue wear and to reduce the loss of working fluid through the packings.”
Packings of the “ Ramsbottom ring ” type are shown by this patent, the packings shown in Fig. 1 below having three pockets or lantern spaces illustrated as “ a,” “ b,” and “ c.”

*810

The packings shown in Fig. 2 below have two such?pockets, “ a ” and “ b ”.
These several pockets are described as connected “to suit-able steam spaces or in the case of turbines to different-parts in the expansion of the steam.” The space a, which is nearest to the interior of the turbine, is described as connected to “ a higher-pressure point than is the space 5,”' page 1, line 65, and the outer pocket or space c is described as maintained at atmospheric pressure, page 1, line 69. There is thus obtained what plaintiffs’ expert witness terms- “ gland staging,” which is based on the anology of “ pressure *811 staging ” in a turbine, the word “ staging ” suggesting that the total pressure drop in the steam through the packing is subdivided into separate stages or pressure levels instead of being one continuous pressure drop or gradient.

The idea of the patent in suit is to distribute the fall in pressure from inlet to outlet end of the packing more evenly over all the rings than would be the case should there be only one pocket provided, and to this end the patent provided a plurality of pockets, the intermediate pocket or pockets being connected to steam spaces within or without the turbine, *812 in which the pressure is of such intermediate value between the pressure at the inner end of the packing and the pressure at the outer pocket as to provide a nearly constant gradation of pressure through the packing, page 1, lines 39-41; or to produce “ a slow and even pressure gradient between each lantern space and the next,” to the end of preventing “ undue wear ” on the packing rings, and resultant “ loss of working fluid ” through them.
We are of opinion that the subject matter which any of the Government turbines have in common with the patent in suit is fully shown by patents on this subject prior to the patent in suit and that it is, therefore, invalid.
We will consider first the British patent No. 9024 of 1898, issued to Clarke & Warburton, Fig. 1 of which is shown below:

The above figure shows a ring-packing gland for a turbine shaft in which gland there are provided two lantern spaces or pockets marked “ U, U,” respectively, which are connected by pipes to points in the turbine of lower pressure than that prevailing at the turbine end of the packing. This patent states on page 3, line 36, “At a suitable point or points in such series a collecting chamber or chambers is or are provided as shown at U, U, in Fig. 1, communicating by a pipe u, or pipes, with one or more of the low-pressure chambers of the turbine, so that leakage is directed thereto.”
*813 Plaintiffs’ objection to the showing of this patent is on the ground that only one pipe, marked u is seen in the drawing. The evidence, however, leads ns to the conclusion that the pipe used, shown in Fig. 1, is the one leading from the outer pocket, and that the other pipe leading from the inner pocket underlies the first pipe and is not, therefore, seen in the drawing. This underlying pipe, in accordance with the specification, would be connected to a higher stage of the turbine; that is, a point of higher pressure than that to which, the overlying pipe u is connected. The specification of this patent therefore discloses the principle of “ gland staging ”; namely, the maintenance of the inner pocket at a higher pressure than that of the outer pocket, the outer pocket being connected to a stage in the turbine where the pressure is substantially atmospheric. But if the two pockets shown in the Clarke & Warburton patent are connected to the same steam space in the turbine, and therefore maintained at the same substantially atmospheric pressure, that patent shows all that the Government uses, for both the pockets in the Government installations are likewise maintained at the same substantially atmospheric pressure. No distinction could therefore be drawn between the Government packings and the Clarke & Warburton patent on this ground. It is evident, therefore, that on any interpretation of claim 2 the patent in suit which would enable it to be read on the Government turbines, the claim equally reads on Clarke & Warburton patent, in that it shows “ a ring packing gland for rotating shafts comprising a number of rings on the shaft find a plurality of lantern spaces disposed around the shaft, said lantern spaces communicating with noncontinuous parts in the ring packing and with suitable steam spaces, substantially as described.”
We think Clarke & Warburton respond equally to claim 3 of the patent in suit, except for the requirement of claim 3 that the steam shall be “ supplied ” to one lantern space while it is being “ exhausted ” from others. The Government turbines, however, do not have this feature.
The evidence establishes that the Clarke & Warburton turbine is a noncondensing turbine which exhausts not to a condenser but to atmosphere, and that the pressure at the *814 outlet end, and therefore at the outer pocket “ U ” in the packing is substantially atmospheric. We are of opinion that Clarke & Warburton disclose a subject matter that is common to the claims in the Parsons’ patent in suit and to any of the Government packings in question.
The next patent in the prior art is one to Fielden, No. 722219, defendant’s Exhibit D-50. This patent discloses the principle of gland staging in Fig. 1, shown below:

The above figure shows a stuffing box, that is, a packing, for an engine shaft in which there are provided two lantern spaces or pockets which lead off the steam leaking through the packing; the patent states “ to different and gradually lower conditions to correspond to exhaust pressures from the stuffing box at different places in its length.” Page 1, lines 30, etc. This patent specifically shows a packing for a reciprocating engine, and suggests that in the case of a triple-expansion engine the inner pocket H should communicate “with a middle-pressure receiver between the high and *815 middle pressure cylinders ” and that the outer pocket M should communicate with the “ low-pressure receiver between -the middle-pressure and low-pressure cylinders.” Page 2, dines 79-92.
The low-pressure receiver in a triple-expansion engine •is normally at atmospheric pressure, and the middle-pressure receiver is maintained at a pressure intermediate 'between atmospheric pressure and boiler pressure. Fielden ■therefore disclosed the idea of gland staging as defined in -■the record, including the maintenance of the outer pocket at substantially atmospheric pressure and the maintenance • of the inner pocket at a pressure intermediate between the •pressure at the inner end of the packing and atmospheric -pressure.
Plaintiffs contend that the foregoing conclusion is not ■supported by any description in the Fielden patent as to -the steam pressure maintained in the pockets of the stuffing ■box and that it is contrary to express statements to the effect that the pressures in all pockets or chambers of the stuffing box are to be between the high cylinder pressure and atmospheric, and, therefore, above atmospheric pressure.' The claims of the Parsons’ patent in suit are silent as to whether the pressure in all of the pockets is above atmospheric or not. Plaintiffs attempt to read into the claims one of the points mentioned in the specification, that the outer pocket -is maintained at atmospheric pressure; but, in arguing for : infringement, they disregard the specification in the Parsons’ -patent which sets forth as the essence of the invention that there shall be a “ nearly constant gradation of pressure •through the packing.” The passages in the Fielden patent ■ to which plaintiffs refer are general descriptions not dealing •with the-outer pocket, but emphasizing the fact that one, or more, of the pockets is connected to a point where the pressure is greater than atmospheric pressure. Any attempt •• therefore-to distinguish the Fielden patent on the ground -that the outer pocket in his construction is not maintained at atmospheric pressure is of no avail.
*816 It is also argued by tlie plaintiffs that the Fielden patent shows a packing for a reciprocating shaft and not a packing-for a rotating shaft, such as is used in the turbine; that a Ramsbottom ring packing could not be used to pack a reciprocating rod due to the necessary intermeshing relation of the rings in the sleeve of the packing and the collars on the shaft which permit of rotary movement of the turbine shaft but would not permit of reciprocatory movement of' a piston rod; and that the same is also true of the labyrinth form of packing elements used by plaintiff company in its plural pocket turbine shaft packings and used extensively in the Government packings.
While the Fielden patent specifically shows a packing for a reciprocating engine shaft, it states expressly that “ It is equally adapted as a stuffing box for any other purpose.” The evidence shows that the art of packing turbine shafts was derived from the art of packing reciprocating engine-shafts, and that the terms used in the Parsons’ patent in suit are terms derived from the reciprocating engine art. It is established that “ Ramsbottom rings ” were used in packings for reciprocating engine shafts before they were used in packings for turbine shafts, and that the term “ lantern spaces ” was derived from the reciprocating engine art. But this is not, in reality, a case of analogous arts. It is a case of the same means being used for the same purpose and producing the same result in the same art. We are convinced from the evidence that nothing more than ordinary engineering skill would be required to apply the principles disclosed in said Fielden patent to a packing for a shaft of a ship.
The next patent which we will consider in connection with the question whether Parsons was the first inventor of the subject matter of claims 2 and 3 of the patent in suit under the rule laid down in Milburn Co. v. Davis-Bournonville Co., 210 U. S. 390, is one to Davidson, No. 190680, for which application was filed April 25, 1903, defendant’s Exhibit D-51. Fig. 1 of this patent is shown below. This patent in our opinion discloses the principle of “ gland staging ” as defined in the record and found in the patent in suit.

*817

Tlie above figure 1 shows a turbine having a ring packing provided with two lantern spaces, numbered 31 and 32, respectively, which are connected with points of lower pressure in the turbine, the outer lantern space 31 being connected to point 27, which is of lower pressure than the point 26 to which the inner lantern space 32 is connected. In this we find, in substance, the subject matter of claim 2 of the patent in suit, namely, “ a ring packing gland for rotating shafts comprising a number of rings on the shaft and a plurality of lantern spaces disposed around the shaft, said lantern spaces communicating with non-continuous parts in the ring packing and with suitable steam spaces, substantially as described.”
We think this Davidson patent also shows the subject matter of claim 3 of the patent in suit with the exception of the supply of steam to one lantern space while it is exhausted from other lantern spaces, which feature the Government does not use.
Plaintiffs attempt to differentiate the Davidson construction from that of the patent in suit on the ground that the Davidson packing is not on the turbine shaft. We think this is immaterial. The Davidson packing is a packing *818 between a part which, rotates with the shaft and the casing, .and his purpose to subdivide the fall in pressure through the packing so as to produce what is defined in the record as “ gland staging ” is present in Davidson’s patent as in the patent in suit. The Davidson packing existed for the purpose of preventing leakage of steam from the interior of the turbine to the exterior thereof, and it is immaterial whether the packing was located directly on the shaft or on a part rotating with it.
Exception is also taken by plaintiffs to the Davidson patent on the ground that the outer pocket is not maintained at atmospheric pressure. It is true that pocket 31 of the Davidson j>atent is maintained at a pressure above atmospheric, but in function this pocket 31 is not the outer pocket in the Davidson patent but an intermediate pocket in the device, the outer pocket which is maintained at atmospheric pressure being functionally present in the Davidson structure by the space marked “ Y ” on the copy of the patent in evidence, which space is in communication through pipe 18 with the exhaust of the turbine.
The evidence establishes that the turbine shown in the Davidson patent is a non-condensing turbine. If the turbine were condensing, the exhaust, and therefore the space “ Y ” would be maintained at condenser vacuum and there would be a tendency for air to leak in through the journal 12 into the interior of the turbine and no tendency for any leakage of steam from the turbine through the journal; but the specification of the patent states at page 1, lines 66-70, that “ the journals 12 are formed by the ends of a shaft 12a, on which the drum 14 is fixed, and 12b indicates means for preventing the leakage of steam between the said shaft and the casing 10.”
We are of opinion that the Davidson patent shows in substance the 'three-pocket packings like the three-pocket packings shown in the Parsons’ patent, with the space “ Y” serving as the third or outer pocket, and that it also shows “ gland staging ” in the sense in which that term is defined in the record or found in the patent in suit.
In our opinion, the foregoing patents of Clark & War-burton, Fielden, and Davidson disclose all that the Govern- *819 meut packings have in common with the Parsons’ patent, No. 790744, and they disclose the principle of obtaining the nearly constant gradation of pressure through the packing by the expedient of providing a plurality of lantern spaces in it, and connecting the inner pockets to points where pressure is intermediate between that at the inner end of the packing and atmospheric pressure. We conclude, therefore, that this patent is invalid in view of the disclosures in the patents mentioned.
The fourth patent in suit is No. 858206 granted to Charles Algernon Parsons June 25, 1907, on an application filed August 6,1906. Claims 1, 2, and 3 of this patent are charged to be infringed.
This patent relates to shapes and angles of blades in turbines, and Figures 1 to 5 thereof are shown below.

*820

This patent shows the blading of a reaction turbine divided into four groups, each group consisting of a plurality of rows of interspaced fixed and moving blades. The blades in each group are of the same shape and have the same exit angles, but the shape and the exit angle of the blades varies from group to group. The blades in the first group at the inlet end of the turbine are bilaterally non-svm-metrical and have exit angles which are relatively small, measured with reference to the direction of the rotation of the blades.
The claims of the patent herein set forth speak of the angles of the blades with reference to the direction of the path of the steam, whereas it is usual in the art to measure these angles with reference to the plane of rotation of the blades. In the findings and opinion we adopt the nomenclature of the art rather than that of the patent. When, therefore, we speak of an increase of angles, we have reference to that which the patent means by a decrease of angles, a decrease of angles with reference to the direction of steam flow being increase of angle with reference to the plane of rotation.
The blades in the first group of the patent are called “ normal ” blades; those in the next group are less non-symmetrical and have larger exit angles. These blades are styled in the patent as “ semiwing.” The blades in the third group show a greater approach to symmetry and have still larger exit angles and are called in the patent “ wing ” blades. The blades in the final group at the outlet end of *821 the turbine are approximately bilaterally symmetrical and have the largest exit angles of all the blades. These are called in the patent “ double wing ” blades.
The patent explains that there is difficulty in dealing with the increased volume of steam as it expands through a turbine toward the outlet end without unduly lengthening the blades and that “the object of the present invention is to enable the use of shorter blades in the lower pressure parts without seriously impairing the efficiency of the turbine.” Page 1, lines 24r-27.
The blades in the successive groups as shown in the patent not only change progressively from group to group as regards bilateral symmetry, but also become flatter in curvature from group to group, such flattening being a necessary consequence of increasing the exit angle of the blades as shown in the patent while maintaining the entrance angle in all the blades at substantially 90 degrees, as shown in the patent.
The claims of the patent are as follows:
1. In turbines, rows of blades, at considerable angles to the impinging fluid and bilaterally non-symmetrical near the high pressure end of the turbine, rows of blades at lesser angles to the fluid flow and approximately bilaterally symmetrical near the low-pressure end of the turbine.
2. In turbines, rows of blades near the inlet end, set at considerable angles to the impinging fluid and bilaterally nonsymmetrical, successive rows of blades at diminishing angles to the fluid flow, substantially as described.
3. In a turbine in which steam passes through rows of blades in series, rows of blades near the high-pressure end, set at considerable angles to the impinging fluid and bilaterally nonsymmetrical, successive groups of rows, e, f, and g, at decreasing angles to the impinging fluid and approximating to bilateral symmetry, substantially as described.
Claims 1 and 3 of this patent, among other things, require that the blades near the high-pressure or inlet end of the turbine shall be bilaterally non-symmetrical and that the blades toward the outlet or low-pressure end of the turbine shall be approximately bilaterally symmetrical. This fea *822 ture is not present in any of the Government turbines charged to infringe.
Claim 2 requires, among other things, that blades near the inlet end shall be bilaterally non-symmetrical. This feature of claim 2 is not present in any of the Government impulse turbines, the blades of which are in all cases bilaterally symmetrical. The blades of the Government Westinghouse turbines in all cases are bilateral non-symmetrical.
As in the case of other patents in suit, hereinbefore considered, we are of opinion that this patent is invalid in view of the disclosures in the patents hereafter mentioned.
The evidence shows that the only features of construction which any of the Government systems of blading have in common with the systems shown in patent No. 858206 are consecutive rows of blades with their angles of discharge, measured with reference to the plane of rotation, increasing from the inlet end to the exhaust end of the turbine, together with the flattening of the curve of the blades which results from such increase of exit angles.
A prior United States patent, No. 828710, issued to Parsons October 20, 1885, -defendant’s Exhibit D-56, discloses.' the idea of the patent in suit of increasing the exit angles^,, decreasing them with reference to the direction of the flow of the steam, in order to provide for the passage of increased volumes of steam due to expansion thereof in the turbine. This patent states on page 1, line 51, that the increased passage required by the steam may be obtained “ either by an increased area or.by an increased pitch of the blades or by an increased area and pitch combined,” and on page 3, line 35, that “ It will also be seen on reference to the drawings that where the steam enters the blades are set at a greater angle than where it exhausts; hence as the steam pressure decreases it meets with sets of blades of increased, area and pitch, the increase being so calculated that the-velocity of the steam shall be suitable to that set of blades, between which it has to pass.” Fig. 1 of this patent No.. 828710 is shown below:

*823

The showing of the blades in the drawings of this patent is so small that the increase of angle referred to in the specification can not be readily seen, but the specification makes the construction clear. At the time of this patent the blading of turbines was crude and the patent shows the ordinary straight blades customarily used at that period; but the patent states on page 3, lines 7-12, that while straight blades are shown on account of their ease of manufacture other forms of blades may be employed. Thereafter, as the art progressed, curved blades, bilaterally nonsymmetrical in shape, came into use in reaction turbines, and such blades are shown in patent No. 639608 to Parsons issued December 19, 1889, defendant’s Exhibit D-59. We think there was nothing more than ordinary engineering skill involved in substituting the new form of blade, when it came into use, for the straight blade shown in the old patent, No. 328710, using at the same time the principle of' increasing exit angles therein set forth.
Plaintiffs question these prior patents to Parsons as pertinent prior art on the ground that they do not show any progressive flattening or decrease in curvature of the blades from the beginning to end of the turbine. The claims of the patent in suit say nothing about any flattening or decrease in curvature of the blades. The change in exit angles described in the first patent to Parsons, No. 328710, when applied to a turbine having the curved nonsymmetrical blades shown in the later patent to Parsons, No. 639608, *824 would normally result in the progressive flattening of the curvature of the blades as the exit angles were increased .as shown in the patent in suit.
The next example of the prior art is the Westinghouse turbine built by the Westinghouse Company in 1896 and sold by that company in March, 1897, to the Nichols Copper Company of Brooklyn, New York, and thereafter used by the latter company. This turbine is fully described in Binding XXXIII. The only difference, so far as the subject matter referred to in the claims in suit is concerned, between this 1896 turbine and the Westinghouse turbines involved in this suit lies in the fact that in the old turbine the flat type of blades, crimped at their edges, was used, whereas, in the Government Westinghouse turbines involved in this •suit, the improved curved blades later developed in the art and shown in Parsons’ patent No. 639608 of 1899 are used. The blades in the 1896 turbines were bilaterally non-sym-mertical throughout, as are the blades in the Government Westinghouse turbines charged to infringe the patent in suit.
We find next in the prior art the Musil publication, of 1904, which, in our opinion, discloses the subject matter which the Government turbines, or any of them, have in •common with the patent in suit. Musil states (page 6, translation, Exhibit D-122) that “ The smaller the exit angle of the fixed and rotating buckets, the larger will be the steam pressure drop and peripheral velocity that can be utilized in a turbine wheel, and therefore the smaller will be the number of stages required, which in general would be a favorable consideration. But these small angles result in long and narrow channels which increase the steam friction and also cause eddy current losses, due to the sharp ■changes of the cross-sectional area of the channels. The magnitude of this angle is in the mean 20 to 25 degrees. With the decided expansion of the steam and the very rapid increase of its specific volumes, it is impractical to retain this angle in the wheels of the last stages, in spite of the fact that these buckets are mounted on larger diameters, because the buckets will become impracticably long. In order to' meet this difficulty it is necessary to enlarge the exit angle of the buckets toward the exhaust.” Musil was describing *825 Parsons’ blading, and be illustrates typical reaction blades in Fig. 40 below:

Musil’s statement is the teaching of the patent in suit as regards exit angles. These angles are, according to the patent, to be increased toward the outlet end of the turbine so as to accomodate the increased volume of steam and “ to enable the use of shorter blades in the lower pressure parts,” than would otherwise be required to accomodate the steam.
Plaintiffs object to Musil’s disclosure on the ground that the description is not clear and that it is merely a theoretical disquisition of a speculative character, and, on the further ground, that it lacks any statement as to how much the angles should be increased. The patent in suit does not specify the extent to which the angles should be increased.. The substance of the objection to Musil’s publication is that, he did not mention any flattening of the curvature of the blades accompanying the increase of exit angles. The flat-ening of the curvature of the blades is not an element of the claims of the Parsons’ patent in suit. The claims do not mention this feature but they do contain the express requirements as to symmetry.
For the foregoing reasons and in view of the facts as set forth in Finding XXXIV we are of opinion that the Musil publication adequately disclosed to persons skilled in the *826 turbine art all features of construction which are common to the monox)oly expressed in claim 2 of patent No. 858206 in suit and to any of the Government turbines charged to infringe.
The next matter in the prior art with reference to patent No. 858206 in suit is the article in Zeitschrift fur das Gesamte Turbinenwesen,” Exhibit D-110, published July 15, 1905, describing “ The Union ” turbine. In our opinion this article discloses the subject matter which is common to the Government turbines and the Parsons’ patent in suit and, also, the additional feature of a progress from non-symmetrical forms of blading in the early stages to a symmetrical form at the outlet end of the turbine to which the claims in suit are directed. It discloses a reaction turbine with the exit angles of the blades in the last row greater than the exit angles of blades in the preceding rows with the blades in the last row bi-laterally symmetrical and with those in the preceding rows bi-laterally non-symmetrical, and with the blades in the last row having a less degree of curvature than the blades in the preceding rows. Fig. 12, illustrated in this article, is shown below:

Plaintiffs argue that this publication does not disclose the invention of the patent in suit or suggest any of its operating principles and advantages; that there is nothing in the text ■of the publication which refers to shapes of the blades of the *827 reaction portion of tbe machine or 'to any modification or ■change of the cross-sectional contour and angle of the blading toward the low-pressure end of the turbine; that there is no disclosure of a modification of cross-sectional contour and •angle of blade toward the low-pressure stages to enable reducing the length of the blades in the low-pressure stages, but that the longitudinal sectional view in Fig. 11 shows the blades increasing in length or height from the steam-receiving to the exhaust'end of this blading; and, finally, that there is no disclosure of a turbine having blading with a lessening of the curvature of the blades and increase of their discharge angles measured to the line of blade rotation, in the low-pressure stages or toward the low-pressure end, such .as to operate with increased steam volocity to assist in the disposal of increased volumes of steam through the low-pressure stages and to maintain an efficiency Or power of output of those blades. Although the text of the article contains no statement about the form of blading, the illustration, Fig. 12, accompanying it shows a series of rows of reaction blades with the exit angles of blades in the last row increased as compared with the angles in the earlier .rows, the exit angles in the earlier rows being about 29 ■degrees and the exit angles of the last row about 40 degrees. Moreover, the flattening in curvature of the blades would follow as a natural consequence in reaction blading of increasing the exit angles as is shown in this illustration— the curvature of blades at the final stage being shown as considerably less than that of the earlier blades. In this instance the shape of the blades as regards symmetry also ■changes, as in the patent in suit, the earlier rows of blades ■being non-symmetrical and the blades in the last row approaching bi-lateral symmetry. This article, therefore in our opinion, discloses the subject matter common to the Gov■ernment turbines and the patent in suit, and, also, the feature to which the claims of the patent are directed; i. e., the progress from non-symmetry to symmetry, which feature the Government turbines do not contain. We are of opinion, therefore, that said article of July, 1905, adequately discloses to persons skilled in turbine art the features of construction *828 which are common to the patent in suit and to any Government turbines charged to infringe the said patent.
The next prior art patent is one to Wilkinson, No. 822799, for which application was filed June 23, 1905, on which patent was granted June 5, 1906." This patent shows an impulse turbine in which the successive rows, or groups of rows, of blades have their exit angles increased progressively from the inlet end to the outlet end of the turbine, for the same purpose as in the Government turbines, together with a resulting flattening of the curves of the blades progressively from the inlet to the outlet end of the turbine. This is shown by a comparison of blades numbered 10,11,12, and 13, respectively, Fig. 1 below:

This patent to Wilkinson is chiefly devoted to an explanation of the structural reasons for the increase of exit angles which it shows in the nozzle elements carried in the successive stages (Figs. 1, 2, 3, and 4); but the change in exit angles of the blades, or buckets, is likewise specifically mentioned as well as their progressive flattening or decreasing curvature. Wilkinson states on page 2, line 10, that “ I therefore propose to provide the turbine above described with rows of buckets having increasing angles and decreasing concavity toward the low pressure end of the turbine ”; and at lines 35-38 of the specification, in describing Fig. 1, he points out that it shows “ a successive increase in the degree of nozzle inclination and bucket angle, while there is a successive decrease in the bucket concavity or *829 curvature and depth.” Wilkinson therefore disclosed the principle of increasing exit angles and progressive flattening or decreasing curvature of the blades and, therefore, in our opinion, disclosed the subject matter which the patent in suit and the Government turbines have in common. He did not disclose the progress from non-symmetry to symmetry in the form of his blades which is required by the claims, but neither do the Government turbines use that subject matter.
The next patent to be considered on the question whether Parsons was the first inventor is one to Curtiss, No. 996317, Exhibit D-58, for which application was filed August 24, 1905, and patent issued June 27,1911. This patent discloses the principle of an increase of exit angles toward the outlet end of the turbine and the resulting progressive flattening of the curvature of the blades. Fig. 1 of this patent is shown below:
In Fig. 1 Curtiss shows the expansion curve of steam at decreasing pressures and in Fig. 2 below he shows a diagram indicating the progressive increase in blade heights which would be necessary to accommodate this increasing volume of steam if the exit angles remained unchanged. On page 1, lines 37-54, and on page 2, lines 44r-53, he points out that it is not necessary to increase the bucket heights to this extent if the exit angles of the blades near the outlet end of the turbine be increased, which is the thought expressed in the Parsons’ patent in suit.
As shown in Fig. 5 below, this Curtiss patent shows the last few rows of nozzles and moving blades as being progressively increased exit angles.
It is apparent from an examination of Fig. 5 that the increase of exit angles is accompanied by the usual flattening of the curvature of the blades and at page 3, lines 19 and 20, the patentee specifically points this out in the statement that the successive rows of moving buckets “ become gradually flatter, as described in connection with Fig. 5.” This patent to Curtiss therefore shows the two features contended by plaintiffs to constitute the common subject matter between the patent in suit and the Government turbines, i. e., the progressive increase of exit angles and the progressive flattening or decreasing curvature of the blades.

*830

*831 Curtiss did not show the feature required by the claims in suit of progress from bi-lateral non-symmetry to bi-lateral symmetry, but the Government turbines charged to infringe do not contain this feature. We are of opinion, therefore,

that the Curtiss patent discloses the features of construction which are common to patent No. 858206 in suit and to any of the Government turbines charged to infringe said patent.
The next patent in prior art is one to Frederick W. Gordon, No. 791415, Exhibit D-55. This patent shows a

velocity-compounded impulse turbine in which the successive rows of buckets have their exit angles increased from row to row, with corresponding flattening of the curvature of the buckets as illustrated in Fig. 3 below:
*832 Plaintiffs insist that this patent is not pertinent because different principles apply to velocity-compounding from those which apply to pressure-compounding. The Gordon patent was cited by the Patent Office against the application

for the Parsons’, patent in suit and the broad claims contained in the application, which were not limited to the method of change from non-symmetry to symmetry of blades, were rejected on the Gordon Patent (Finding XXXIX); File *833 Wrapper, Exhibit D-60. The patentee Parsons acquiesced in the rejection and made no effort to differentiate the Gordon patent from his claimed invention on the ground of any difference between pressure-compounding and velocity-compounding. The broad claims were canceled and in their stead stood the narrow claims which now appear as claims 2 and 3 of the patent, including the limitation as regards the matter of symmetry. The evidence establishes that in a velocity-compounded turbine the steam does not expand in volume during its progress through the velocity-compounded stage, but its velocity decreases in such stage from one row of moving blades to the next row so that there exists in such turbine a reason for increasing the exit angles of blades toward the outlet end similar to the reason for increasing such angles toward the outlet end in the pressure-stage turbine. We are, therefore, of opinion from the evidence of record that nothing more than ordinary engineering skill was required to apply to pressure-stage turbines the principle of increased exit angles disclosed in certain Gordon patents as applied to velocity-stage turbines.
Plaintiffs contend that there is present in the Government turbines charged to infringe Parsons’ patent -858206 in suit, the operating feature of the blading invention of that patent consisting of increase in the actual steam speed through the blading at the exhaust end of the turbine, such increase in the actual steam speed through the blading being the “ carry over ” of velocity from one row to another, or “ increased absolute velocity ” of steam toward the end of the turbine resulting from the increase of blade angles. Assuming, as claimed by plaintiffs, that there is an increase in the actual or absolute velocities of steam in the low-pressure stages of the Government turbines, and of the ratio of such velocity to blade velocity, the evidence establishes that a similar increase in actual or absolute velocities and in such ratio in corresponding stages would take place in the prior-art turbines above considered, resulting from their similar change of exit angles. Moreover, the claims of the patent in suit make no reference to the mode of operation as regarding velocities, but only to structural features, and the increase of steam velocities and ratio referred to is not vital to an embodiment *834 of the teachings of the Parsons’ patent in suit. A feature which is not vital to the teachings of the patent is no differentiation from the prior patents. A prior-art turbine not having this feature could nevertheless embody all that is vital to the teachings of the patent in suit. Since therefore the prior patents and turbines show the same structure as that of the Government turbines so far as change in blade angle is concerned, the prior patents and turbines must also have this increase of absolute velocity if the Government turbines contain it.
For the purpose of avoiding the effect upon the patent in suit of the “ Zeitschrift ” article, the Wilkinson and Curtiss patents, hereinbefore discussed, plaintiffs contend that Parsons conceived the invention of patent No. 858206 and that knowledge of the alleged invention was communicated to persons in this country at a date as early as the spring of 1905, the application for the patent having been filed August 6, 1906. The evidence of record does not establish conception or use by the patentee Parsons of features of construction referred to in claims of this patent in suit on any date prior to the date of filing of the application therefor. Nor does the evidence establish that the patentee Parsons, or anyone, deriving knowledge from him, introduced knowledge of any of the features of constructioh referred to in the patent into the United States at a time prior to the filing of application therefor.
The last patent in suit, No. 899319, is one issued to Charles A. Parsons and George G. Stoney, said Stoney being assignor tc Parsons. This patent was issued September 22, 1908, on application filed October 8, 1906. Claims 1, 2, 3, 4, 5, 9, and 10 of this patent are charged to be infringed by the turbine blading used by the Government in its turbines.
This patent is concerned with the provision of close clearance between rotating parts and stationary parts in a turbine, and this is to be provided in such a way that if by accident the rotating parts come in contact with the stationary parts no serious interference with operation of the turbine or damage will occur. The general method shown in the patent is to provide a thin edge on the fixed or on the rotating part, or on both, which, if the parts make contact, will be worn away *835 easily without causing breakage. The patent shows two ways of accomplishing this result. Figs. 1 and 2 of the patent are shown below:

In the above illustration the turbine blades are shown as thinned-to an edge by beveling or chamfering them on one side, or on both sides, at the region near their free ends. Figs. 3 and 4 of the patent in suit are shown below:

In the form shown in the last illustration a continuous band or shrouding is mounted on the free edges of the ring of moving blades, or in the fixed casing opposite the blades, or in both places, such shrouding having serrated or sharp edges on its outer surface.
The patent states no preference as between the two methods of accomplishing the result. On page 1, line 39, it is-stated that “ The invention consists in forming the ends of the blades with narrow edges or in providing on the blades *836 or the casing or drum, strips of serrated cross section so that if too close contact takes place between a fixed and a moving part very narrow edges only are subjected to the wearing action whereby the tendency to damage or stripping and the losses due to skin friction are reduced.”
The patentee states on page 2, lines 28-30, that “ This invention is applicable to turbines and rotary compressors working with steam, oil, gas, or any kind of fluid.” The evidence shows that the same principle is also applicable to other rotating elements of a turbine, such as packing rings, as well as to blades, and that the principle of the patent has been applied in practice to “ dummy piston rings ” which the Parsons Company provides in its turbines.
The claims of this patent charged to be infringed are as follows:
1. A turbo-machine blade of decreasing cross section toward one end the reduction commencing a short distance from said end.
2. A turbo-machine blade thinned only at the end remote from the member which carries it.
3. A turbo-machine blade thinned to an edge at the end only which comes opposite to the drum or casing.
4. A turbo-machine blade chamfered at the end remote from the member which carries the blade.
5. A turbo-machine blade chamfered on one side to form an edge at the end remote from the member which carries the blade.
9. A turbo-machine blade of substantially uniform cross section from its root end to a short distance from its free end, its free end being reduced in cross section.
10. A turbo-machine blade of uniform width throughout its length but of reduced thickness at its free end, the reduction of thickness commencing a short distance only from said end.
We find in prior art patents the use of the expedient disclosed in the forms illustrated in the patent in suit in rotary engines, including steam turbines, and in turbine blades, as well as in packings.
The first patent in the prior art is one to Fullagar, No. 784670, Exhibit D-62, granted March 14,1905. This patent *837 states the problem of providing close clearance between blades and casing in a turbine and, at the same time, preventing accidental damage, and shows, we think, the same remedy as is disclosed in Figs. 3 and 4 of the patent in suit. Fig. 1 of the Fullagar patent is shown below:

It will be seen that Fullagar fits shrouding or “bailing rings,” consisting of U-shaped strips of thin metal, over the ends of his blades as shown in Fig. 1 above at to, and states that since the edges of these rings are very thin “ the presence of water will not cause serious friction between them and the casing or drum, nor will they become dangerously heated or melted should accidental contact occur at high speed.” We fail to find any material difference between the construction disclosed in the Fullagar patent and that shown in the patent in suit in Figs. 3 and 4; in fact, there is practically no dispute as to this, but the plaintiffs take the position that the embodiment of the alleged invention is shown in Figs. 1 and 2, supra, of the patent in suit, is superior to the embodiment shown in Figs. 3 and 4. The patentee, however, treats the two methods as equivalent and *838 this position is in disagreement with the statement of the patent in suit.
The next prior art patent is one to Fulagar, No. 815155, defendant’s Exhibit 63, granted March 13,1906, on an application filed February IT, 1905, in which, in our opinion, is shown, in a dummy packing for a turbine, an expedient similar to that shown in Figs. 1 and 2 of the patent in suit. Fig. 3 of this patent is set forth below :

The patent shows in Fig. 3 above a labyrinth packing for a dummy piston in which close clearance between the stationary casing and the rotating element is important. In this packing the packing rings projecting from the casing are thinned or sharpened at their edges in the same manner and, obviously, for the same purpose as the blades in Figs. 1 and 2 of the patent in suit. Fullagar does not mention in his specifications this thinning of the edges, but he clearly shows that in his drawing, and in his discussion of that matter on page 2, lines 41-58, he had the matter of close clearance in mind. He states: “ Turbines constructed according to this invention have advantages over those of previously known construction. For instance, they are more compact and loss of steam and power is reduced, since it is possible to employ finer clearances upon small balance pistons than *839 can be used with small ones, both because any deviation or vibration of the spindle causes a greater variation of clearance the larger the piston, and also because such large pistons, having high peripheral velocity, are liable to cause serious damage if they should come accidentally into hard contact with the part of the casing or cylinder that surrounds them. Also, owing to this high peripheral velocity, the unavoidable presence of water in the packing-grooves causes very considerable friction and loss of power.” Although this patent does not relate specifically to turbine blades, there is in the dummy packings, as in the case of blades, the same problem of establishing as low clearance as possible between the parts rotating at high speed, and accomplishing it in a safe way. We think that in view of the disclosure of this patent, no more than ordinary mechanical skill was required in thinning the tips of the turbine blades as shown in Fig. 2 of the patent in suit.
The patentee Parsons in his prior patent, No. 775634, granted November 22,1904, shows the expedient of thinning the edges of the packing rings in the turbine. Fig. 8a of this patent is set out below:

The above illustration shows a ring packing between a stationary part of the turbine h and the rotating disc b, *840 wherein close clearance between the fixed and rotating parts is necessary. The packing consists of a series of packing ring segments h, which are shown as thinned or sharpened at their edges, manifestly for the same purpose for which the turbine blades are thinned in the patent in suit. These segments are described in the patent as “ edged segments touching or nearly touching the rim.”
The next prior art patent is one to Sturgeon, No. '762453, Exhibit D-64, which, in our opinion, discloses an example of the thinning of blades in a steam turbine in the manner illustrated in Fig. 2 of the patent in suit. This thinning is shown where the blades I1 appear in cross section in Fig. 3 of the patent to Sturgeon set forth below:

The blades in this turbine are of different shape from those in the patent in suit, being of spiral form, as indicated in the lower part of Fig. 1; they are, however, “ turbo-machine blades ” and they respond literally and fully to each of the claims of the Parsons’ patent in suit. They show, in the langauge of claim 1 of the patent in suit, a turbo-machine blade of decreasing cross section toward one end, the reduction commencing a short distance from said end. A comparison of the structure shown by Sturgeon with the other claims in suit leads us to the conclusion that claims 2, 3, 4, 5, 9, and 10 of the Parsons’ patent in suit equally read on the structure shown by Sturgeon.
The next patent which we will consider in the prior art in connection with the patent in suit now under consideration is one to Hyndman, No. 122118, Exhibit D-66, granted December 26, 1871. This patent discloses the use of an expedient for close clearance, as shown in Figs. 1 and 2 *841 of tbe patent in suit. Fig 2 of tbe Hyndman patent is shown below:

Tbe patent shows in the above illustration a rotary blower or air compressor, including a fan having blades I which, for proper operation, should rotate in close clearance with the casing of the compressor. These blades aré shown beveled or chamfered at their ends to form an edge. The patent states that the blades I are “ drawn to an edge, so as to have but one point of contact, which allows cinders or any other substance which may have fallen or been drawn in to pass through between the fans without injury to the blower.” In the Hyndman patent, as in the patent in suit, it was necessary to provide close clearance and, at the same time, to avoid damage by accidental contact. Although Hyndman contemplated the danger of contact between the blades and cinders accidentally present rather than between the blades and the casing, the problem and the remedy were nevertheless the same as in the case of the patent in suit. We think there can be no material distinction between the patent in suit and Hyndman’s on the ground that the latter was dealing with rotary compressors rather than steam turbines. The patent in suit expressly states that this invention is applicable to turbines and rotary compressors working with steam, air, gas, or any fluid. We conclude, therefore, *842 that the Hyndman patent anticipates the patent in suit in that it shows turbo-machine blades thinned or chamfered at their ends to form ah edge in substantially the same manner as in Fig. 2 of the patent in suit.
The next patent in prior art is one to Simpson, No. 223547, Exhibit D-67, which discloses an instance of the thinning of tips of blades of a rotary steam engine or turbine in a manner which we think is similar to that shown in the patent in suit. Fig. 1 of this patent is set forth below:

The blades C shown in the above illustration as attached to the rotor of the machine are operated by the momentum of a current of water impelled by an injected current of steam discharged through the nozzle F, and, as shown by the drawings, these blades make close clearance at their ends *843 with the casing of the machine. Although Simpson does not mention the thinning of the edges, his purpose in doing so was obviously the same as in the patent in suit. He apparently considered the expedient as an obvious one.
Upon consideration of this prior patent we conclude that it shows turbo-machine blades thinned or chamfered at their ends to form an edge in substantially the same manner as illustrated in Fig. 2 of the patent in suit.
The next prior art patent is one to Wentzky, being British patent No. 1227, of 1896, Exhibit D-68, which discloses another instance of the thinning of edges of turbine blades. Fig. 1 of the Wentzky patent is set forth below:

The above illustration shows a water-operated turbine; however, the principle in the patent in suit is applicable to turbines operated by water as well as by steam. The blades 8 and 9 of the Wentzky turbine are shown thinned to an edge at their tips.
Plaintiffs argue that the statement in Wentzky patent at page 1, lines 21-27, that “ The arrangement of the two feed nozzles D is the following — as shown in Fig. 1, the longitudinal median line of the nozzle D strikes the point of the *844 third bucket or float (counting from the top) of the float wheel C, whilst the fourth float is struck in its middle. The longitudinal line of nozzle E strikes the eighth bucket or float at 0.2 of its total length, and the ninth at 0.6 of its total length. Hence the position that one of the buckets or floats of the wheel is always under the influence of the jet, and is struck by it about its middle so that the turbine can be started at any moment,” shows that the water used to operate this turbine strikes two of the turbine blades at the same time. It is contended that this obviously precludes close clearance over the ends of the blades, since water discharged from the nozzle must pass over the end of the first blade to reach the next one. Examination of the patent drawing, however, shows that the passage refers only to the situation existing as the turbine blades are passing the discharge orifices of the nozzles. Elsewhere throughout the turbine there is no intercommunication between the channels formed by adjacent turbine blades, and the theory of the patent requires that there be no intercommunication. This means that the blades are intended to operate with very close clearance with relation to the turbine casing. This is pointed out in the patent at page 1, lines 37-40, where it is stated that “ To avoid this loss, it is important that each bucket or float, filled with water and closed on all sides, and not communicating with the next bucket or float, should travel a distance equal to one-third of its own length so as to empty itself suddenly.” Wentzky therefore clearly intended to have his blades operated with close clearances with relation to the turbine casing. In our opinion the said patent to Wentzky shows turbo-machine blades thinned or chamfered at their ends to form an edge in substantially the same manner as in Fig. 2 of the patent in suit.
The plaintiffs are not entitled' to recover and the petition must be dismissed. It is so ordered.
Whaley, Judge; Williams, Judge; Green, Judge; and Booth, Chief Justice, concur.